# United States Court of Appeals
## For the First Circuit

No. 24-2086

UNITED STATES,

Appellee,

v.

NAPOLEON GONZALEZ, a/k/a Guillermo Gonzalez,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Barron, Chief Judge,
Gelpí and Aframe, Circuit Judges.

Andrew Levchuk for appellant.
Lindsay B. Feinberg, Assistant United States Attorney, with
whom Andrew B. Benson, United States Attorney, was on brief, for
appellee.

July 30, 2026

**GELPÍ, Circuit Judge.** Napoleon Gonzalez ("Napoleon")[1] assumed the identity of his deceased brother to obtain a passport and collect Social Security benefits under both his own name and his brother's. A jury convicted him of multiple offenses arising from that scheme. On appeal, he argues that venue in Maine was improper for two of the counts on which he was convicted and that the restitution award accompanying his sentence was excessive. After careful review, we **affirm** the convictions and restitution order.

## I. Background

### A. Factual Background

We begin by describing the facts most relevant to this appeal. Napoleon was born in August 1937. His younger brother, Guillermo Gonzalez ("Guillermo") was born roughly a year and a half later, in January 1939, but tragically died a few months after his birth. Decades later, Napoleon assumed Guillermo's identity. Although he had his own Social Security number ending in x4546, Napoleon obtained a second Social Security number ending in x3188 in Guillermo's name. He then used both identities to collect Social Security Administration ("SSA") retirement benefits.

---

[1] We use first names to more easily distinguish between the Gonzalez brothers' identities because they share the same last name. See, e.g., United States v. Ponzo, 171 F.4th 507, 511 (1st Cir. 2026).

Napoleon first applied for Social Security benefits under his own name in September 1999, the first full calendar month after he turned sixty-two (and the earliest he could apply for benefits, see 42 U.S.C. § 402(a)). During the application process, he asked the SSA to update his earnings record, explaining that he had worked under the name Guillermo Gonzalez for some time, too. At that time, he told SSA agents that he had assumed the Guillermo name in memory of his grandfather, also named Guillermo, after he died. Based on his representations (and after confirming his grandfather's name), the SSA added the earnings recorded under the Guillermo identity to Napoleon's Social Security record.

In February 2001, the first full calendar month after which Guillermo would have turned sixty-two, Napoleon applied again for retirement benefits. This time, he applied under Guillermo's name. He confirmed that the Guillermo earnings record was accurate and affirmed that he had not filed any prior applications for Social Security benefits. He never mentioned that Guillermo's earning record had been added to Napoleon's. So, for almost twenty years after the second application, Napoleon received Social Security benefits under both identities simultaneously.

Napoleon's scheme was discovered in early 2020 when Detective Michael Ross ("Detective Ross") of the State of Maine's Bureau of Motor Vehicles Division of Enforcement, Anti-Theft, and

Regulations discovered two separate state identification cards featuring different names, Social Security numbers, and dates of birth, but whose photographs were flagged as potential matches. He pulled the applications for both identification cards and noted that the phone numbers and addresses for both "Napoleon Gonzalez" and "Guillermo Gonzalez" either matched or were very similar. He also found a death certificate indicating that a "Napoleon Gonzalez" had died in 1984, which raised his suspicions regarding the individuals' true identities.

Detective Ross set up an interview with Napoleon at his house. During the interview, Napoleon identified himself as "Napoleon Gonzalez" and acknowledged that both identification photographs depicted him. This time, he offered a new justification for the dual identities, asserting that he had been authorized to use both names by the U.S. Air Force Office of Special Investigations ("OSI") during an undercover assignment in the 1960s. (Subsequent inquiries with the OSI confirmed that no record of such authorization could be found.) When Detective Ross asked about the death certificate he found in Napoleon's name, Napoleon explained that he had already resolved the matter with the SSA Office of the Inspector General ("OIG").[2] Napoleon then

---

[2] Napoleon was referring to an earlier incident involving the SSA. Around 2010, the SSA had discovered a death certificate in Napoleon's name and terminated the retirement benefits associated with that account. But Napoleon went to an SSA OIG office, met

- 4 -

voluntarily provided Detective Ross his Napoleon Social Security card, a Guillermo passport, and a Napoleon U.S. Department of Veterans Affairs benefits card.

Based on what he learned from the interview, Detective Ross referred the investigation to Special Agent Eric Dos Santos ("S.A. Dos Santos") with the SSA OIG for possible social security fraud and Special Agent Katie Giroux ("S.A. Giroux") with the U.S. Department of State's Diplomatic Security Service for possible passport fraud. S.A. Dos Santos confirmed that Napoleon was collecting Social Security benefits under both names and suspended Guillermo's benefits, pending an investigation. S.A. Giroux's investigation revealed that Napoleon had submitted three U.S. passport applications to the Department of State. In 1982, he submitted a passport application in the name of Guillermo Gonzalez, with Guillermo's birth date of January 1939, but using the SSN ending in x4546 (the one assigned to Napoleon). In 1996, he submitted another passport application, also in the name of

---

with an agent, and explained that Napoleon Gonzalez was his true identity, that he was alive, and that he had never used any other identities. Based on this meeting, the SSA reinstated benefits to the Napoleon account.

According to the presentence report and the agents' interviews with Napoleon, the death certificate stemmed from an earlier scheme. In 1984, Napoleon purchased a corpse in Puerto Rico to fake his own death and, among other things, claim the benefits of his own life insurance proceeds while claiming to be Guillermo. Although probation officers could not independently corroborate this, Napoleon said he was imprisoned for three years following an insurance fraud conviction in 1988.

Guillermo Gonzalez, but this time with the SSN ending in x3188. In 2017, Napoleon renewed a passport in Guillermo's name. S.A. Giroux confirmed that Napoleon later used that passport to travel to Canada in 2018. As the investigation continued, S.A. Giroux uncovered evidence of additional passports that were not picked up in her initial search. She also found death certificates for both Guillermo (with a 1939 date of death) and Napoleon (with a 1984 date of death) -- the fraudulent one.

Based on these findings, S.A. Giroux and S.A. Dos Santos went to Napoleon's house for another interview in September 2020. During the interview, Napoleon admitted he was born "Napoleon Gonzalez" and that Guillermo was his deceased brother. Once again, he claimed to have worked for the OSI and have taken on the Guillermo identity in relation to that work. He further claimed that, from 1964 onward, he stopped using the Napoleon identity and worked as Guillermo except when enlisting in the Army reserves in 1979 or 1980.

When asked about his use of the Guillermo passport, Napoleon confirmed that he used it on July 7 and 9, 2018, to cross the border between the United States (exiting via the Rainbow Bridge at Niagara Falls) and Canada (re-entering via the Peace Bridge in Buffalo, New York).

## B. Procedural Background

A grand jury sitting in the District of Maine returned a six-count indictment against Napoleon Gonzalez. Count One charged identity theft, in violation of 18 U.S.C. § 1028(a)(7)); Counts Two and Three charged making a false statement in the application for and use of a passport, in violation of 18 U.S.C. § 1542; Count Four charged Social Security benefit fraud, in violation of 42 U.S.C. § 408(a)(4); Count Five charged furnishing false information to the SSA, in violation of 42 U.S.C. § 408(a)(7)(A); and Count Six charged mail fraud, in violation of 18 U.S.C. § 1341.

Prior to trial, Napoleon did not move to dismiss Counts Two and Three for improper venue under Federal Rule of Criminal Procedure 12(b)(3)(A)(i). But in his trial brief, Napoleon argued that the government could not prove, by a preponderance of the evidence, that he made the false statement in his passport application while in Maine or that he used the passport secured by his false statement in Maine when traveling from New York to Canada. So, he maintained that he could not be tried in Maine for those offenses. A two-day trial ensued, during which the district court gave preliminary instructions on venue, addressed the issue with the parties as part of the charge conference, gave a final instruction on venue, and used a special verdict form that required the jury to determine venue for Counts Two and Three. After

deliberations, the jury found that the government had proven by a preponderance of the evidence that venue was appropriate in the District of Maine for the two passport fraud offenses and found Napoleon guilty of all six offenses. He was then sentenced to five years of probation and ordered to pay restitution in the amount of $175,757.00, plus a $600 special assessment.

Napoleon -- who turns eighty-nine next month -- timely appealed.

## II. Discussion

Napoleon now raises two challenges: first, that the trial evidence did not support the jury's venue determination for Counts Two and Three; and second, that the restitution order was excessive. We address each in turn.

## A. Venue

A criminal defendant has the right to be tried in the proper venue. United States v. Salinas, 373 F.3d 161, 164 (1st Cir. 2004). For crimes committed within a state, the Constitution establishes a right to trial in the state and district where the crime was committed. See U.S. Const. art. III, § 2, cl. 3 ("The Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed . . . ."); id. amend. VI (requiring trial of a criminal case "by an impartial jury of the State and district wherein the crime shall have been committed"); see also Fed. R. Crim. P. 18 ("[T]he government must prosecute an

- 8 -

offense in a district where the offense was committed.").  When determining where a crime was committed, and hence where venue is proper, courts first look to the statute under which the defendant is charged.  <u>Salinas</u>, 373 F.3d at 164.  If Congress has included a venue provision, that provision controls so long as it satisfies constitutional requirements.[3]  <u>Id.</u>

The Constitution treats crimes committed <u>outside</u> any state differently.  Rather than prescribing a venue, it authorizes Congress to designate one.  U.S. Const. art. III, § 2, cl. 3 ("[W]hen not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.").  In turn, Congress has determined that trial for offenses committed outside of the United States "shall be in the district in which the offender . . . is arrested or is first brought; but if such offender or offenders are not so arrested or brought into any district, an indictment or information may be filed in the district of the last known residence of the offender."  18 U.S.C. § 3238.

Napoleon argues that venue was improper for Counts Two and Three.  Both counts arise out of 18 U.S.C. § 1542, which criminalizes two distinct forms of passport fraud.  First, it prohibits knowingly and willfully making a false statement in an

---

[3] We note that the Supreme Court has recently referenced Congress's ability to dictate venue.  <u>See</u> <u>Abouammo</u> v. <u>United States</u>, 146 S. Ct. 1571, 1577 n.3 (2026).  That reference, however, does not bear on our resolution of this case.

application to obtain a U.S. passport (Count Two). Second, it prohibits knowingly and willfully using, attempting to use, or providing to another a passport that was obtained through a false statement (Count Three). The jury found that venue was proper in Maine for both offenses.

We review these findings in turn. Our standard of review compels us to "uphold the verdict if a rational juror could have found proper venue by a preponderance of the evidence." United States v. Abbas, 100 F.4th 267, 280 (1st Cir. 2024) (citation modified).

### 1. False Statement in Passport Application

We begin with Count Two. We have explained that making a false statement in a passport application is "a point-in-time offense, which can," and generally will, "be prosecuted at the place of the false statement." Salinas, 373 F.3d at 169. That is, the offense will typically be prosecuted where the applicant filled out the passport application. See id. at 165. Accordingly, here, the government bore the burden to prove that Napoleon filled out the passport application in Maine. But satisfying that burden did not require the government to pinpoint the exact location where Napoleon filled out the form or to eliminate every conceivable alternative venue. Rather, venue could be established through circumstantial evidence, United States v. Tang Yuk, 885 F.3d 57, 73-74 (2d Cir. 2018); United States v. Plezia, 115 F.4th 379, 394

- 10 -

(5th Cir. 2024), and, again, the government needed only to present evidence from which a rational jury could conclude that it was more likely than not that the application was completed in Maine, Abbas, 100 F.4th at 280.

The government met that burden. It introduced evidence that Napoleon had lived continuously in Maine for roughly fifteen years by the time he submitted the application. It introduced the application itself, which listed his mailing address -- the address where he would expect to receive the passport -- as Etna, Maine. The jury also heard testimony from S.A. Giroux that, based on the form used, the application would have been submitted by mail rather than completed at a passport acceptance facility. And the government showed that the resulting passport was ultimately recovered from Napoleon's residence in Maine.

Although, as Napoleon emphasizes, there was no direct evidence of his whereabouts when he filled out the passport application, the government's circumstantial evidence was sufficient. Completing a passport renewal application is not typically a spontaneous act. It ordinarily requires gathering supporting documents, photographs, and payment before mailing the application. A rational jury could therefore conclude that a person who had lived in the same Maine town for more than a decade, listed that residence on the application itself, and later possessed the resulting passport there, most likely completed the

- 11 -

application where he lived.  That is a permissible inference.  See, e.g., United States v. Stitzer, 785 F.2d 1506, 1519-20 (11th Cir. 1986) (holding that venue could be inferred from evidence that the defendant followed the same drug-trafficking route on prior occasions despite no direct evidence that he used that route on the charged occasion); United States v. Johnson, 956 F.3d 510, 517-18 (8th Cir. 2020) (relying on evidence that the defendant lived and worked in the district during the relevant period and bank records placed him there on or around the dates of the charged conduct).  Venue was therefore proper as to Count Two.

## 2. Use of a Passport Obtained through a False Statement

We turn next to Count Three, the use-based passport fraud.  Unlike the offense addressed above, we have not yet had occasion to address where venue lies for this charge.  But the parties to this appeal agree that the question turns on where the passport was used, so we focus on that question now.

Napoleon argues that the passport was used on the United States side of the border, in New York, and thus venue was only proper there.  The government, instead, argued to the jury that the passport was used in Canada, and thus the district of Napoleon's last known residence -- Maine -- was proper under 18 U.S.C. § 3238.  The jury found that the government had proved by a preponderance of the evidence that venue was appropriate in

- 12 -

Maine.  We cannot say that this did not constitute a rational verdict.

The government introduced testimony from S.A. Giroux explaining that:

> [I]n the U.S., in particular, you do not encounter a U.S. immigration official on your exiting of the country.  Instead, you would be presenting your travel documentation to whatever country that you're entering into.  So in the case of Canada, you would present it once you have crossed into Canadian territory and present it to a Canadian official.  In this case, it's the Canadian Border Security Agency ["CBSA"].

S.A. Giroux further testified that the Guillermo passport contained a distinctive entry notation used by Canadian border authorities.  Based on her training and experience, she recognized it as indicating that Napoleon (passing himself as Guillermo) had been encountered by CBSA officers on July 7, 2017, at the Rainbow Bridge in Niagara Falls, Ontario.

From this evidence, the jury could reasonably find that Napoleon used the passport in Canada.  And because the offense was committed outside the "jurisdiction of any particular State or district" of the United States, venue was proper in the district of Napoleon's last known residence under 18 U.S.C. § 3238.

### B. Restitution

Lastly, we take up Napoleon's challenge to the district court's ordered restitution.  We review preserved challenges to

restitution orders for abuse of discretion.[4]  United States v. Mahone, 453 F.3d 68, 73 (1st Cir. 2006).

Restitution generally seeks to make victims whole by ordering defendants to compensate them for the actual losses caused by their offense.  United States v. Simon, 12 F.4th 1, 64 (1st Cir. 2021).  In this case, the government's losses arose from the fact that it overpaid Social Security benefits to Napoleon. Specifically, it overpaid because Napoleon manipulated his earnings record (from which Social Security benefits are calculated) and simultaneously claimed benefits as a separate person.  The difficulty, however, was that the record did not clearly establish which portion of Guillermo's earnings had been double counted -- that is, credited to Napoleon's earnings record without being removed from Guillermo's.  That lack of clarity mattered because, whenever the amount of loss is disputed, the government bears the burden of proving the loss by a preponderance of the evidence.  18 U.S.C. § 3664(e).

---

[4] The government argues that Napoleon waived any challenge to the amount of restitution he must pay and that our review is therefore limited to plain error.  As explained below, the government proposed four alternative restitution calculations based on different assumptions about the fraud scheme.  According to the government, Napoleon expressly advocated for Scenario Two before the district court and therefore cannot now argue for Scenario One, which would result in a lower restitution award.  We conclude, however, that Napoleon adequately preserved the issue underlying his present argument for Scenario One -- namely, that Scenario Four is incorrect.

To satisfy that burden and account for the uncertainty surrounding Napoleon's earnings history, the government proposed four alternative scenarios, each based on a different assumption about how Napoleon's earnings should be reconstructed. All scenarios worked by attempting to consolidate all of the defendant's actual earnings onto a single record and calculate the amount of benefits he would have received under that record from 1999 (the first year Napoleon was eligible for Social Security benefits) through February 2020 (when Napoleon's fraud was discovered and his benefits suspended).[5] The difference between the combined benefits paid to both the Napoleon and Guillermo identities, and the amount of benefits that would have been paid under a single record, represents the amount overpaid to the defendant during that period, and the government's loss.

The following table shows the yearly earnings posted under each record, which the government used as the basis for its calculations:

| Year | Napoleon | Guillermo | Year | Napoleon | Guillermo |
|------|----------|-----------|------|----------|-----------|
| 1955 | $429.59 | $0.00 | 1971 | $4,502.28 | $6,013.14 |

---

[5] Consolidating earnings onto a single record was important because Social Security retirement benefits are calculated using a progressive formula based on a worker's indexed lifetime earnings. See 42 U.S.C. § 415(a)(1)(A). Thus, the same earnings can produce higher aggregate benefits when divided between two earnings records than when credited to a single record.

| Year | Napoleon | Guillermo | Year | Napoleon | Guillermo |
|------|----------|-----------|------|----------|-----------|
| 1956 | $1,433.65 | $0.00 | 1972 | $3,503.16 | $6,312.44 |
| 1957 | $1,518.90 | $0.00 | 1973 | $11,545.76 | $11,032.54 |
| 1958 | $1,029.60 | $0.00 | 1974 | $12,950.00 | $15,950.00 |
| 1959 | $1,132.46 | $0.00 | **1975** | **$14,100.00** | **$14,100.00** |
| 1960 | $1,456.00 | $0.00 | **1976** | **$15,300.00** | **$15,300.00** |
| 1961 | $1,594.60 | $0.00 | **1977** | **$16,500.00** | **$16,500.00** |
| 1962 | $2,011.00 | $0.00 | **1978** | **$17,900.00** | **$17,900.00** |
| 1963 | $2,191.32 | $2,191.33 | **1979** | **$19,020.00** | **$19,020.00** |
| 1964 | $0.00 | $1,385.26 | **1980** | **$17,601.00** | **$17,601.00** |
| 1965 | $1,655.92 | $2,341.28 | **1981** | **$5,050.13** | **$5,050.13** |
| 1966 | $0.00 | $2,993.27 | 1982 | $8,238.42 | $0.00 |
| 1967 | $0.00 | $3,494.85 | 1983 | $14,264.72 | $0.00 |
| 1968 | $3,259.24 | $3,162.05 | 1984 | $17,499.20 | $0.00 |
| 1969 | $4,341.88 | $4,205.51 | 1985 | $1,172.89 | $0.00 |
| **1970** | **$6,760.44** | **$6,760.44** | | | |

Let us review each proposed Scenario. Under Scenario One, the government assumed that all earnings reflected on both the Napoleon and Guillermo records were unique. It therefore combined the earnings from both records into a single earnings history and calculated the benefits that would have been payable had those earnings appeared on only one record. The district court rejected this Scenario because it found inconceivable that

- 16 -

Napoleon would have worked different jobs under two identities while earning exactly the same amount for multiple years.

Under Scenario Two, the government treated all years with identical earnings (bolded above) as duplicates and counted those earnings only once. It then combined the earnings reported under the Napoleon and Guillermo records for all other years. The district court rejected this approach because it did not reflect the way it understood the fraud to have operated. The district court explained:

> When [Napoleon] applied for Social Security benefits under . . . Napoleon Gonzalez, he presented a record of benefits that included Guillermo Gonzalez's earnings and he did not present those earnings only in the years when his earnings and Guillermo's earnings were identical, he presented all of Guillermo's earnings as if they were his earnings as additional earnings.

(Emphasis added.) In other words, Scenario Two incorrectly assumed that duplication occurred only in years where Napoleon's and Guillermo's earnings happened to match, rather than throughout the earnings records.

Scenario Three also treated all identical earnings as duplicates, but it further assumed that, for the years following the first exact duplicate year (1970), even though the entries are not identical, they still represent a duplication of some, but not all, of the defendant's earnings. For each of these years, it credited the higher of the two earnings figures rather than

- 17 -

combining them.  For all years prior to 1970, it combined earnings from both records.  The district court found that, like Scenario Two, Scenario Three contradicted the way it understood the fraud to have been carried out.

Finally, Scenario Four assumed that the earnings under the Guillermo identity were incompletely copied to the Napoleon identity, but that the defendant never worked under both names in the same year.  It reconciled this by crediting Napoleon with the higher earnings figure appearing on either record for each year, without combining earnings for any year.  As the government explained, this approach struck a middle ground between two possibilities: one where each identity may have had unique earnings (which would hurt the defendant if not counted), and one where earnings were just partially -- not fully -- copied from Guillermo's record to Napoleon's (which would hurt the government if double counted).  The district court adopted this Scenario, reasoning that it was "the most logical and most accurate based on what we know the defendant did in submitting Guillermo's earnings to Social Security as his own."

On appeal, Napoleon argues that the district court erred in selecting Scenario Four because the government failed to establish that he worked under only one identity in any given year by a preponderance of the evidence.  We disagree.

As the government's sentencing memorandum set out for the district court, Napoleon's own statements suggested that he worked under only one identity at a time. Napoleon explained that he worked as Napoleon from 1957 to 1964, at which time he began working as Guillermo. Consistent with that account, he reiterated that, after 1964, he stopped using the Napoleon identity except when enlisting in the Army reserves in 1979 or 1980. And when specifically asked whether he had worked as Napoleon or Guillermo at a job he took in 1969, Napoleon responded: "Napoleon [was] out of the way [then] . . . everything from 1964 everything is going to be Guillermo not Napoleon." Only two years of earnings record data, 1955 and 1956, are not accounted by Napoleon's own admissions. And those years only have earnings recorded on Napoleon's record.

From this, we think the government presented sufficient evidence from which the judge could find that Napoleon did not work under both identities in any given year and that the higher earnings record for each year alone should be credited. After all, "[a] district court's calculation of restitution is not held to standards of scientific precision." United States v. Sánchez-Maldonado, 737 F.3d 826, 828 (1st Cir. 2013). "The law cannot be blind to the fact that criminals rarely keep detailed records of their lawless dealings, [totaling] up every column and

- 19 -

accounting for every misbegotten dollar." United States v. Savoie, 985 F.2d 612, 617 (1st Cir. 1993).

Moreover, as the government explained, Scenario Four resulted in the most reasonable restitution amount because Napoleon's earnings from 1956 through 1962 ranged from $1,029 to $2,011, then increased to $2,191.32 in 1963. 1963 is the first year in which earnings were recorded on Guillermo's record, in the amount of $2,191.33 -- just one cent more than what was recorded in Napoleon's record. If both sets of earnings were credited as distinct income, Napoleon's earnings would inexplicably double in 1963, then drop sharply to $1,385.26 in 1964 (when income was recorded only on Guillermo's record), before surging again to a combined total of $4,007.20 in 1965 (when both records have earnings). Scenario Four avoided these implausible fluctuations, whereas Scenarios One, Two, and Three did not. As such, the district court did not abuse its discretion in ordering restitution according to the calculations proposed by the government in Scenario Four.

### III. Conclusion

For the foregoing reasons, we **affirm** the jury's determination that venue was proper and uphold the district court's restitution order.